# SUPERIOR COURT,

## FALL SESSIONS,

## 1884.

SAMUEL W. McCAULLEY and J. AUGUSTUS McCAULLEY, executors and devisees of WILLIAM McCAULLEY, deceased, appellants *v.* SYBILLA McCAULLEY, widow and devisee of WILLIAM McCAULLEY, deceased, respondent.

*Defence in Orphan's Court—Widow's Election of Dower.*

The Orphans' Court in this State is not a Court of Equity and has no power to refuse an order to assign dower upon any other defence than one which would be available at law.

An agreement between husband and wife and a trustee for the latter, made during coverture, that in consideration of her enjoying separately, and absolutely controlling her separate property, she would relinquish her dower in his lands, will not be effective as an equitable bar to her right of election to take dower in lieu of the interest given to her by her husband's will.

(*New Castle, Oct. 30, 1884.*)

APPEAL from the Orphans' Court of New Castle county in the matter of the assignment of dower in the estate of William McCaulley, deceased.

William McCaulley died on or about the twenty-second day of September, 1883, leaving a last will and testament, which was duly admitted to probate by the Register of Wills for New Castle county.

The testator devised a certain proportion of his estate, which largely consisted of realty, for the benefit of the respondent.

On the fifth day of January, 1884, the respondent made her

election to take dower in the real estate of her said husband in lieu of the estate so devised for her benefit, and on the same day filed her petition in the Orphans' Court for New Castle County, praying for the assignment of dower to her.

On the sixteenth day of February following, and before any order had been made upon the petition aforesaid, the respondent's counsel filed in the cause a certain deed executed between the said William McCaulley and Sybilla McCaulley, and one Robert Waddell, bearing date December 1st, 1868, the said deed being mentioned in the will of Mr. McCaulley.

On the sixteenth day of February aforesaid, the Orphans' Court allowed the appellants, as executors and devisees of Mr. McCaulley, by their counsel to intervene in the matter of the application for the assignment of dower aforesaid.

Whereupon the counsel for said executors and devisees filed the following exception to said application for dower, to wit:

" That the said petitioner in and by a certain instrument in writing filed in this cause bearing date the first day of December, A. D. 1868, between the said petitioner Sybilla McCaulley and William McCaulley the testator, her then husband, and one Robert Waddell of the city of Trenton and State of New Jersey, for the considerations therein mentioned, and by the receipt by the said petitioner of the benefits and advantages to her thereunder, did relinguish and bar her demand of dower in the estate of her husband William McCaulley, the said testator.

After argument by counsel, the Court, on the twenty-third of February last past, ordered that dower be assigned to the widow in accordance with the prayer of her petition, and directed the issuing of a commission to make such assignment.

On the same day, the executors and trustees prayed an appeal, which was granted, and an order made for the transmission of the papers and record in the case to this court.

This appeal lies by virtue of Section 10, Article VI, of the Constitution of Delaware.

*Edward G. Bradford,* for appellants:

The trust deed of December 1, 1868, between William McCaulley, his wife and Robert Waddell, clearly evidences a contract

between the husband and wife, that she should " renounce all interest in the real and personal estate of her said husband, the said William McCaulley, except what he may give and devise to her by his last will and testament or by deed or other instrument during his lifetime."

The deed merely serves to evidence the existence of a contract between husband and wife, and to execute it on the part of the husband.

This undertaking of the wife was supported by full consideration, viz.: The complete surrender by the husband of his marital right over the moneys, choses in action and other personal property of the wife, as well as her real estate.

It is true that the Married Women's Act of 1865 was then in force, but its operation was limited to " real estate, mortgages, stocks and silver plate belonging to any married woman at the time of her marriage, or to which she may become entitled at any time during her coverture."

Under the trust deed Sybilla McCaulley had full power to dispose of the property therein mentioned without the consent or against the will of her husband, by " gift, deed, assignment or writing in the nature of a will."

But the property transferred in trust was by no means limited to the several species mentioned in the act of 1865.

It embraced " certain United States bonds, New York 7 per cent. bonds,      *      *      *      certain moneys deposited in the hands of W. McCaulley & Co., and sundry other notes, bonds, debts, choses in action and personal property."

William McCaulley gave up all his marital rights over this property, and thus furnished ample consideration for the undertaking of his wife.

As soon as the deed became operative, the contract was *ipso facto* executed on the part of William McCaulley, while it remained executory on the part of his wife.

Upon this contract William McCaulley rested in good faith, and in and by his will not only recognized it, but made a provision in conformity with it.

He gave the income of one eleventh of his estate to his wife for life, " to be deemed and taken in lieu and bar of dower in my

estate. I make this provision for the love and affection I bear her, she having her own estate which is ample, and there being a marriage contract between us authorizing each party to have and manage his or her estate without the claim or interference of the other, and in bar of dower, said marriage contract being in the hands of ———— Waddell, of Trenton, New Jersey, etc."

Now having for nearly sixteen years received the benefit for which she contracted in bar of her dower, she has the assurance to press her application for its assignment.

At common law a jointure was not a bar to dower; but the wife could retain the former and also insist upon the latter.

*Clancy on Married Women*, 219.

But under the statute of 27 Hen. VIII, c. 10, dower could be absolutely barred by jointure of the required nature, made before marriage.

*Clancy on Married Women*, 213.

But that statute has never been adopted in whole, either in substance or terms, in Delaware.

In 1683 it was enacted with respect to the disposition of estates of decedents, that one-third should go to the widow, " unless it appear that an equal provision be made elsewhere."

*App. 1, Del. Laws*, 16, § 109.

No distinction was made in the above act between an equal provision made before and one made after marriage.

In either case, the widow was barred.

In 1697 it was enacted that " All testators real estates, to be invested and remain as their last wills and testaments devise the same. *Provided always*, that no less than one-third part of the said real estate be allowed and invested in the widow, during her natural life, except where due and equivalent provision hath been made before by the testator."

*App. 1, Del. Laws*, 24, §4.

Here also no distinction is made between provisions made before and after marriage.

So, in 1700 a similar provision was enacted.

*App. 1, Del. Laws*, 28.

In 1742 it was provided with respect to intestate real estate that one-third part thereof should go " to the widow of the said

intestate during her natural life, where such widow shall not be otherwise provided for by marriage settlement."

*App. 1, Del. Laws,* 66.

In the 24th year of George II., it was provided with respect to intestate real estate, as follows: "One-third part of the said lands, tenements and hereditaments to the widow of the said intestate, during her natural life (where such widow shall not be provided for by marriage settlement or otherwise)," &c.

*1 Del. Laws,* 288, Sect. 5.

It was not until 1816 that any provision was made by law for the widow's election, and then it was restricted to the case of a devise to her by her husband of a portion of his real estate.

*5 Del. Laws,* 175.

Such is the law in this State to-day.

*Rev. Code,* 534, Sec. 5.

The only statutory enactment in force here in relation to the barring of dower by jointure settled on the wife relates to the acceptance by her before marriage of " an estate in, or a charge upon real estate, to take effect at or before the decease of her intended husband, and continue during her life, as a provision for her support in lieu of dower in the real estate of her said intended husband."

*Rev. Code,* 533, Sec. 3.

Land need not be given to, or settled upon, a woman in order to bar her in equity of her dower. The acceptance of a term of years or of a sum of money, or of any other kind of collateral satisfaction, in lieu of dower, is a good bar in equity.

*1 Co. Litt.,* 36 (b) N. 1; *Farrow v. Farrow,* 1 Del. Ch., 457; *Lawrence v. Lawrence,* 2 Vern., 365; *Davila v. Davila,* Ib., 724; *Mundy v. Mundy,* 2 Ves. Jr., **122, 129; *Clancy on Married Women,* 220, 223.

Nor is it necessary that the instrument should expressly purport to be in bar of dower.

*Clancy on Married Women,* 226.

Equity looks to substance and intention rather than form.

*Clancy on Married Women,* 223.

If, then, such collateral satisfaction is sufficient by way of

equitable jointure to bar dower, it is certainly a sufficient consideration for an equitable contract to that effect.

The Orphans' Court may take cognizance of any bar to dower, equitable as well as legal.

*Farrow v. Farrow*, 1 Del. Ch., 457.

In equity the husband and wife may in general enter into contracts with each other, and be bound accordingly.

*1 Bishop on Married Women*, Secs. 718, 719; *2 Spence's Equitable Jurisdiction*, *514; *Smith's Manual of Equity*, pp. 418, 437; *2 Story's Equity Jurisprudence*, Sec. 1395; *Slanning v. Style*, 3 P. W., 338; *Lucas v. Lucas*, 1 Atk., 270.

If it clearly appears that the wife has acted without compulsion, willingly and without threats or fear of her husband's displeasure, equity will uphold her transactions, although the husband may be the beneficiary.

*Grigby v. Cox*, 1 Ves. Sr., 517; *Essex v. Atkins*, 14 Ves., 542.

A court of equity will assent to a transfer to the husband of the wife's estate, when satisfied that the wife is willing and desires the transfer to be made.

*Williats v. Cay*, 2 Atk., 67; *Pearson v. Brereton*, 3 Atk., 71; *Clancy on Married Women*, 538-540; *Minet v. Hyde*, 2 Bro. Ch. Rep., 663; *Campbell v. French*, 3 Ves., 321.

Husband and wife can directly appoint to each other.

*2 Sugden on Powers*, 27; *Bradish v. Gibbs*, 3 Johns, Ch., 523.

While an acknowledgment was unnecessary, it was nevertheless made, before an officer authorized to take it, and evidences the freedom of the wife's will.

Reason and authority both require that in such a case as the present the wife should be bound by her contract.

*Liles v. Fleming*, 1 Dev. Eq., 185, 18 Am. Dec., 585; *Lehr v. Beaver*, 8 W. & S., 102, 42 Am. Dec., 271; *Shephard v. Shephard*, 7 Johns. Ch., *57; *Livingston v. Livingston*, 2 Johns. Ch., *537.

The contract has been fully executed on the husband's part, and the wife now seeks to set it aside, after having enjoyed a full consideration.

For the petitioner to claim dower under existing circumstances

is a fraud upon her husband and his estate, and equity will assist only those who come into court with clean hands.

*Charles B. Lore*, for respondent:

It is a well established rule of the common law that a wife cannot relinquish her dower in the real estate of her husband by executing a release to him, nor in any other way than by joining with him in a conveyance to a third person.

*2 Scribner on Dower*, 309 ; *Carson v. Murray*, 3 Page, 483 ; *Rowe v. Hamilton*, 3 Greenleaf, 63 ; *Martin v. Martin*, 22 Ala., 82 ; *Crain v. Cavana*, 38 Bar., 410 ; *Markling v. Markling*, 30 Ark., 17 ; *Pellon v. Wade*, 31 Ark., 678 ; *Gebb v. Rose*, 40 Md., 387.

Even an agreement made during coverture between a husband his wife and a trustee of the latter, that in consideration of her enjoying separately, and absolutely controlling her separate property, she would relinquish her dower in his lands is invalid and cannot be enforced against her in an action for her dower.

*2 Scribner on Dower*, 309 ; *Townsend v. Townsend*, 2 Sanfd., S. C., 711 ; *Gundob v. Brown*, 2 Abb. N. Co., 295 ; *Randall v. Randall*, 37 Mich, 513 ; *Martin v. Martin*, 22 Alab., 86 ; *Walsh v. Kelley*, 34 Pa., 84.

It is a general rule that although Courts of Equity have concurrent jurisdiction with courts of law to the assignment of dower, yet in the exercise of that jurisdiction where the widow is seeking an *equitable* relief they will treat her claim on a strictly legal right, and be governed by the same rules by which courts of law are controlled, and will not allow an equity to be interposed to defend the dower.

*2d Scribner on Dower*, 164 ; *1 Story. Eq.*, Sec. 630 ; *Maybury v. Brian*, 15 Peters., 21 ; *Blain v. Harrison*, 11 Ills., 384 ; *Todd v. Bylon*, 4 Leigh., 498 ; *O'Brien v. Elliott*, 15 Maine, 125 ; *Potter v. Barclay*, 15 Ala., 409 ; *Campbell v. Murphy*, 2 Jones Eq., 357 ; *Ridgway v. Newbold*, 1 Har., 305 ; *Gana v. Gilruth*, 4 Greese., 453.

A married woman can enter into no contract that will bind her after her coverture (except as prescribed by law.)

*Ross v. Singletin*, 1st Bolus, Ch., 154.

These cases and the reason of them fully establish the principle,

that a married woman can make no contracts during her coverture which shall bind her after she becomes sole unless they be made conformable to certain rules established to operate upon and bind married women.

Nor can she be compelled to make good or execute such a contract.

A Court of Equity cannot, in the observance of fraud, accident or mistake give validity to a contract which is void in law.

Statutes for barring Dower; *Rev. Code*, p. 533; *Rev. Code*, p. 501, Sec. 83.

The deed of a married woman is valid only when taken and acknowledged in conformity with this section.

This contract was not acknowledged before any officer recognized by Sec. 10—and is void.

Where there is an omission of some statutory requirement in the deed of a feme-covert, essential to its validity the mistake cannot be corrected by the court.

*Gebb v. Rose*, 40 Md., 387.

*Anthony Higgins*, for appellants :

If the jointure, settled before marriage with the intention to bar dower be wanting in many of the materials required by the statute, a Court of Equity acting on the consciences of the parties, will enforce a compliance with the contract by the widow, and restrain her from suing for Dower.

*Clancy*, 219-220.

However, although the 27 Hen. will be so far restrained in its operation, equity in the exercise of this jurisdiction will always attend to this distinction made by the statute itself, between provisions settled before and during the marriage, for if they be before marriage, the court *following the act*, will consider them as bars to dower, and if during the marriage, then the widows will not be obliged to take such provisions in lieu of their dower, but will be at liberty to accept or reject them.

*Clancy*, 220; *Clancy*, 231; *Scho. v. Sef.*, 449.

Provisions made during coverture may be divided into two heads :

1. Instruments completed when executed, as deeds, bonds, etc.
2. Wills, etc.

This rule of election may be applied to deeds as well as to wills, yet the decisions on this subject are confined to the latter only, for which Lord Redesdale accounts in this way.

It is settled that any provision, however inadequate and precarious it may be, for which a woman contracts, and which she agrees to accept in lieu of her dower, may be a valid jointure in equity.

*Clancy*, 220, 221.

A court of equity will carry into execution any terms for a married woman, without regard to the nature of the property, and *without regard to the form of the instrument in which the contract has been entered into;* and hold them to be a bar to dower if *the intention appear to have been such.*

*Clancy*, 223; *Davila v. Davila*, 2 Vern., 724; *Drury v. Drury*, 2 Eden., 60; *Estcourt v. Estcourt*, 1 Cox, 20.

An antenuptial contract, which secures to the wife her separate property, and makes no provision for her out of the husband's estate, is a good equitable jointure, if it be a part of such agreement that that wife shall relinquish her dower.

*2 Scrib.*, 389, Chat. 15, Sect. 42, 43; *Andrews v. Andrews*, 8 Term, 79; *Murphy v. Murphy*, 12 Ohio, St. 407; *Healds Petition*, 2 Foster, 265; *Cauley v. Lawson*, 5 Jones Eq., 132; *Logan v. Phillips*, 18 Mo., 22.

The authority of *Courts of law* to admit collateral provisions to bar dower is founded on the Statute of Hen. 8.

But the jurisdiction of Courts of Equity in these matters, existed before that act, upon the principle of enforcing agreements entered into between individuals.

*2 Scrib. on Dow.*, Chap. 15, Sec. 33-(408); *1 Roper H. & W.*, 487.

The husband and wife may, in general, enter into contracts with each other, which to an extent not easily defined, will be recognized as good and enforced in equity.

*1 Bishop Mar. Wom.*, 718; *Ibid*, 166; *2 Spere*, 514; *2 Storys, Eq.*, Smith Manual of Eq., 418, 427, 720.

The wife's inchoate right of dower is a valuable thing held by her, and is therefore good as a consideration.

*1 Bishop*, 722, 723, 758; *Learing v. Learing*, 9 Page, 283; *Garlick v. Strong*, 3 Paige, 440; *Needham v. Sawyer*, 17 Pick, 500.

The wife's contract with her husband will be sustained not only when it is for her benefit, but as well when it casts a burden upon her.

*1 Bishop Mar. Wom.*, 167.

The wife's agreement for a reasonable consideration to make an allowance to her husband out of the income of her separate estate will be upheld in equity.

*1 Bishop*, 167; *2 Storys, Eq.*, 1372; *More v. Freeman*, Bunbury Rep., 205; *Livingston v. Livingston*, 2 Johns Ch., 537, 539.

If the instrument be intended to secure jointure the form of it is immaterial.

*Davila v. Davilo*, 2 Vernon, 274.

A *covenant* to pay a widow an annuity for her life, not charged on lands, is a bar of dower.

*Drury v. Drury*, 2 Eden, 39; *Estcourt v. Estcourt*, 1 Cox, 20; *Wizard v. Singden*, cited in *Drury v. Drury* and in *Estcourt v. Estcourt*, 1 Cox, 22; *Clancy*, 227.

Agreement between husband and wife enforced.

*Shephard v. Shephard*, 7 Johns. Ch., 57; *Lites v. Fleming*, 1 Der. Eq., 185; 18 Am. Dec., 585; *Lehr v. Beaver*, 8 Watts. & S., 102, 42 Am. Dec., 271.

COMEGYS, C. J.:

The first question to be settled is, as to the nature of the Orphans' Court. The defence made in this case is not a legal one, but purely equitable—assuming it to be a defence to the widow's petition. Of course, it is no defence at law, and a court of law would not notice it; but the counsel for the devisees not only claim it to be a good bar in equity, but also that the Orphans' Court is a Court of Equity and can give effect to it. Both these contentions are opposed by the petitioner. The question of jurisdiction, being thus raised, must be first settled. If this court should decide adversely to the claim of jurisdiction, there is an end of the appeal, whatever opinion may be held of the nature and quality of the alleged bar.

The authority cited by the counsel for the devises in support of their position that the Orphans' Court is a Court of Equity for the purpose of giving effect to defences of an equitable nature against dower, is that of Farrow v. Farrow, decided by Chancellor Ridgely sitting as Judge of the Orphans' Court in Kent in 1822. 1 Del., Chancery—Appendix 457. In that case it was a question whether the court could give effect to a contract alleged to be an equitable bar ; and the Chancellor decided that it could, on the ground that the Orphans' Court " is a Court of Equity as to all matters within its jurisdiction, and whatever is a bar at law or in equity may be pleaded."—Page 462.

This decision not being absolutely binding on this court, although entitled to the utmost respect as coming from one so able and learned as the late Chancellor was, and no provision, constitutional or statutory, being pointed out by him for his decision which appears to authorize its comprehensive language, it is proper that we should ascertain what is the true nature and scope of the jurisdiction of the Orphans' Court. It is one thing, it is conceived, for a court to have certain equitable jurisdiction, and quite another to be a Court of Equity with respect to it. The distinction may appear to be subtle ; but it is not, as will be found hereafter.

It is a well established principle of the law, that special jurisdictions are to be regarded strictly, and the acts creating them are not to be liberally construed. Though it may be the part of a Judge, having general cognizance, using the old maxim, *ampliare jurisdictionem*, yet no such liberty will be given to a special Court. We have many examples in our reports where the general doctrine I have announced has been recognized and acted upon. There is, in fact, no law anywhere to the contrary. What, then, is the jurisdiction of the Orphans' Court? To determine this requires a retrospect into the history of the establishment of courts in this locality, and the powers assigned them.

Upon the restoration to the English of the places that had been captured from them by the Dutch in the war ended by the treaty of Westminster of the 9th of February, 1674, the Duke of York resumed possession of his grant from his brother King Charles II—of which New York and its dependency, the Delaware Colony, formed a part—and thereupon by his Governor, Sir

Edmund Andros, promulgated the laws which, eight years before, had been established at Hempstead, Long Island, for the government of the main possession. The ordinance of Andros, by which the laws were introduced here contained the following:

" 2. That there be three courts held in the several parts of the river and bay, as formerly, to wit, one at New Castle, one above at Uplands, and another below at Whorkil.

3. That the said courts consist of Justices of the Peace whereof three to make a quorum, and to have the power of a Court of Sessions without appeal, in which court the oldest Juctice to preside, unless otherwise agreed among themselves; above twenty pounds and for crime extending to life, limbo, or banishment, to admit appeal to the Court of Assizes.

4. That all small matters under the value of five pounds may be determined by the court without a jury unless desired by the parties, as also matters of equity." Page 456.

The Court of Assizes, by the Duke's laws, was to be held in New York once a year on the last Thursday of September. Page 11.

By one of the Duke's laws it is provided as follows (page 44): " That all persons who now have or shall have any estate of goods, chattels, or lands in their possession belonging to any that are under age, shall exhibit an inventory and accounts of that said estate within three months next after publication of this law to the respective Court of Sessions where such estate shall be, and afterwards yearly; and in case such person or persons who have such estate in their hands do not at the time and place aforesaid present the inventory of such estates as aforesaid, then the whole business to the next Court of Assizes where the offender shall be fined for neglect of duty as aforesaid," etc. Here is the first statutory provision with respect to the estates of orphans, and relates to the duties of executors and administrators. There was, before, given to the Court of Sessions, as above stated, equity jurisdiction generally: here is a special jurisdiction but it is one rather ecclesiastical as belonging in England to the ordinary, than equitable as pertaining to a Court of Equity. But it is not legal.

When Penn took possession of his grants from Charles II and the Duke of York, and set up his government over his Province

of Pennsylvania and "the three lower counties upon Delaware"
—now the State—he caused to be enacted what is called, in the
volume cited, "The Great Law, or the Body of Laws of the Prov-
ince of Pennsylvania and territories thereunto belonging passed at
an assembly held at Chester, alias Upland, the 7th day of the 10th
month, called December, 1682." The 67th chapter is as follows:

"Be it enacted, &c., That the Justices of each respective
county Court shall sit twice every year to inspect and take care of
the estates, usage and employment of orphans, which shall be
called the Orphans' Court, and sit the first third day of the week
in the first and eighth month yearly (March and October), that
care may be taken for those that are not able to take care for
themselves." Duke of York's Laws, p. 131. This is the first
legal provision for a distinct session of Court for Orphans' benefit,
and is the origin of the tribunal of Orphans' Court, now a consti-
tutional body.

In Chapter 156 of the "Laws made at an assembly held at
New Castle the 10th day of the 3d month (May), 1684," is to be
found the following: "That monthly and quarterly sessions be
held in every county in this Province and territories by the respec-
tive Justices, and that each Quarter Sessions be as well a Court of
Equity as of Law, concerning any judgment *given in cases by law
capable of trial in the respective County Sessions and Courts.* By
this it appears, not that the sessions were to be Courts of Equity,
but only that *in cases by law capable of trial in them,* they should
have equity jurisdiction also, with respect to such cases. This is
very intelligible; it made those Courts equity as well as common
law tribunals *as to all matters within their common law jurisdic-
tion.* Id. 167.

By the 158th chapter there was provision made for a Court
of Appeals, and for circuit duty. Id. 168.

By the 42d section of the Petition of Right addressed by the
freemen of Pennsylvania and the counties to Benjamin Fletcher,
Governor, it is provided, as follows: "That the Justices of the
respective county court (Court of Session) shall sit twice every year
to inspect and take care of the estates, usage and employment of
orphans, &c., the same as in Penn's "Great Law," above quoted.
Id. 205.

During the Governorship of Benjamin Fletcher, and in the 5th of William and Mary (1693), certain laws were passed by him by the advice and consent of the Provincial Legislature, the third of which is "The law about appeals to the Provincial Courts." By the first section of this act, the jurisdiction civil and criminal of the County Courts is declared, and it is provided that they " shall be held and kept quarterly in every county of this Province and counties annexed, and oftener if occasion be, which County Courts shall be Courts of Equity for the hearing and decreeing all matters and causes cognizable in the said Courts under the value of ten pounds." Then provision is made for appeal to the Provincial Courts, to be held for the county.

This enactment established equity jurisdiction in the Sessions Court, or County Court, under ten pounds. Id. 225.

In 1701 the separation took place between the Province and the Three Lower Counties, and thenceforth there were distinct legislative bodies. But before that event an act was passed entitled, " An act for establishing Courts of Judicature in this Province and Counties annexed," by the first section of which it was directed that there should " be holden and kept a County Court of Sessions " four times a year in each of the counties of Philadelphia, Bucks and Chester (the three upper counties) and in New Castle, Kent and Sussex (the three lower counties) four times each year on certain days mentioned in May, August, November and February, and that there should be a competent number of Justices in every of the said counties appointed by the Governor," &c., three of whom should be a quorum, and were thereby impowered to exercise criminal jurisdiction and "shall award process, call special court, hold pleas, and hear and determine all actions, suits and causes, civil, criminal, real and mixed, observing as near as may be respecting the infancy of this government and capacities of the people, the methods and practice of the King's Court of Common Pleas in England," &c. In the clause next but one following it is enacted—" further, that the said Justices in the respective County Courts shall have full power and are hereby impowered and authorized to hear and determine all such matters and causes of equity as shall come before them in the said courts, wherein the proceed-

ings shall be by bill, answer, with such other proceedings as are necessary in Chancery Courts and proper in these parts," &c.

By the next section a Provincial Court, to consist of five Judges, was established, to sit twice a year in Philadelphia, at least two of the five Judges of which were to go circuit into the counties and hold a court twice in each year on certain fixed days for each county. These courts had jurisdiction of capital felonies (which the County Courts had not) and also apellate jurisdiction from the latter. Notice of the appeals however was to be given by the clerk to the Governor, who was to notify the Judges. Page 113. The Governor also upon application of a party—who had ground to move in arrest of judgment, but did not do it in time—had power to issue a writ of error, &c. The notice to be given by the Governor in cases of appeals, to the Judges (who were to hear them) is probably all that is meant by the expression quoted by Chancellor Ridgely from the 8th Section of the act for establishing Orphans' Court, Vol. 1, D. L., p. 92, or it may be explained by some supposed sovereign power of equity in Governors, as Sir William Keith, Governor from 1717 to 1726 once announced his purpose to hold with the assistance of his council a Court of Chancery for the Province upon a complaint made that Courts of Chancery or Equity had been too seldom held therein. *Duke of York's Laws,* 386.

On page 317 of this volume, it is provided that for the better regulating the Orphans' Court of this government, it is hereby enacted, " That the Justices of the respective County Courts, or a quorum of them, calling to their assistance the Register General, or his deputy for the time being, in each county of this Province and Territories, shall have full power and are hereby impowered to hold and keep the said Orphan's Courts, after the business of the County Court in spring and fall is over, or as often as they shall see occasion, in the same places where the respective County Courts are held from time to time; with full power to award process and cause to come before them all and every such person and persons as are or shall be intrusted with, or in any ways accountable for, any lands, tenements, goods, chattels, or estate belonging or which shall belong to any orphan or persons, under age, either as guardians, tutors, trustees, executors and administrators, and cause

them to make and exhibit, within a reasonable time, true and perfect inventories and accounts of the said estates; and to require and take bonds and security of such guardians, trustees, tutors, executors and administrators for the legacies, portions, shares and dividends of estates, real and personal, belonging to orphans or minors as occasion shall require. With power also to make equal distribution of the surplusage of the said estates as to justice and equity shall appertain; having due regard to the directions and bequests of all last wills and testaments in ordering such distributions, as also to the laws of the government from time to time. With power also to admit orphans or minors, when and as often as there may be occasion to make choice of guardians, or tutors, and to appoint guardians, next friends, or tutors over such as the said court judge too young or incapable, according to the rules of the common law, to make choice themselves: and to order and direct the binding and putting out of orphans or minors apprentices to trades, husbandry, or other employments, as shall be thought fit. And that all guardians, trustees, administrators or tutors which shall be appointed by the respective Orphans' Courts shall be admitted and received, without further admittance, to prosecute and defend all actions and suits relating to their pupils, orphans, or minors, as the case may require, in any court or courts of this Province and Counties annexed. *And it is further* enacted that if any person or persons being duly summoned ten days before the day to be appointed for his or their appearance in the respective Orphans' Court to which the summons is returnable, shall refuse or neglect to appear according to summons, or if when they appear do refuse or delay to become bound, to bring in their inventories, or render accounts as aforesaid, then it shall and may be lawful for the Justices of the respective Orphans' Courts to issue forth their warrants for arresting and committing the person or persons so refusing, or neglecting, to the county gaol where he or they are or can be found, there to remain until they comply with the court's order in that behalf. *Provided always*, that those who bring inventories, give bond and make accounts in the Orphans' Courts pursuant to this act, shall not be obliged to give bond, exhibit inventories or accounts for the same things or estate, to the Register General's office or elsewhere, but that all persons, having the power

of probate of wills and granting administration, in this government shall cause all inventories and accounts as shall be brought to them relating to orphans or minors estates, into the respective Orphans' Courts as aforesaid, to be filed and kept there, and shall receive and take the fees due for the same as if they were to be filed, entered, copied and transacted in the Register General's office." This act was passed 28th October, 1701.

After the separation between the Province and " Lower Counties," an act was passed entitled "An Act for establishing Orphans Courts." The date is not given; but it was somewhere between 1721 and 1726. After referring in the preamble to the fact that several important matters are directed to be done by the Orphans' Court, but that upon perusal of the law directing the doing thereof the same appears to be very deficient, and divers orphans, and persons concerned for them, or entrusted with their estates, labor under great inconveniences, the act provides that the Justices of the Court of General Quarter Sessions of the Peace in each county of this Government, or so many of them as are or shall be, from time to time enabled to hold those Courts, shall have full power and are hereby impowered in the same week that they are or shall be directed to hold the same Courts, or at such other times as they shall see occasion, to hold and keeep a Court of Record in each of the said counties, which shall be styled The Orphans' Court; and to award process and cause to come before them all and every such person and persons who as guardians, trustees, tutors, executors, administrators, or otherwise are or shall be entrusted with or anywise accountable for any lands, tenements, goods chattels or estate belonging, or which shall belong to any orphans, or any persons under age, and cause them to make and exhibit within a reasonable time true and perfect inventories and accounts of the said estates, and to cause and oblige the Register, or such person or persons as for the time being shall have the probate of wills and granting letters of administration in this Government, or deputies upon application made in that behalf, to bring or transmit into the Orprans' Court true copies, or duplicates of all such bonds, inventories, accounts, actings and proceedings whatsoever, now or hereafter being or remaining in the respective offices or elsewhere within the limits of their authority, as do or shall concern or relate to the said

estates, or any of them, and to order the payment of such reasonable fees for the said copies, and for all other charges, trouble and attendance which any officer or other person shall necessarily be put upon in the execution of this act as shall be equitable and just; and if upon hearing or examination thereof it appears to the Justices of the said Court that any of the said officers have misbehaved themselves to the prejudice of any minor, or any concerned for them as aforesaid, the said Justices are hereby required to certify the same accordingly, which shall be good evidence for the party grieved *to recover his damages at common law.* And where any letters of administration shall be granted, and no bond with sureties given as the law in that case requires, such letters of administration shall be and are hereby declared to be void and of none effect; and that the officer or person that grants the same, and his sureties, shall be, *ipso facto,* liable to pay all such damages as shall accrue to any such person or persons by occasion of granting such administration; and the party to whom the same shall be so granted may be sued as executor in his own wrong, and shall be so taken and deemed in any suit to be brought against him for or by reason of his said administration." Then follow other provisions in various sections, all enacted with a view to minors' interests. It is unnecessary to quote them.

The object of this act appears to have been to establish the Orphans' Court as a distinct tribunal unconnected with the County Court, though having the same judges, and also to more correctly define its jurisdiction, as well as enlarge it so that it should embrace every subject affecting the interest of orphans or minors. The 7th section gives the judges power to issue attachments for contempt, and force obedience to " their warrants, sentence or orders concerning any matter or things cognizable in the same courts by imprisonment of body, or sequestration of lands or goods as fully as any Court of Equity may or can do." Then comes the section referred to by Chancellor Ridgely in Farrow v. Farrow. " Sec. 8. Provided always that if any person or persons shall be aggrieved with any definitive sentence on judgment of the said Orphans' Court, it shall be lawful for them to appeal from the same to the Governor for the time being, in equity, which appeal, upon security given as is usual in such cases, shall be granted accordingly."

We find no change in the Orphans' Court until 1802, when an amendment was made to the constitution, adopted in 1792, annulling the 15th section of the 6th article, which constituted the Judges of the Court of Common Pleas the Orphans' Court, and making the Chancellor the sole Judge thereof. This state of things continued till our present constitution was adopted in 1831, which composed the Court of the Chancellor and the resident Judge of the county. In the abrogated section of the 6th article, it is provided that the Common Pleas Judges shall and may exercise the *equity jurisdiction heretofore exercised by the Orphans' Court,* except as to the adjusting and settling of Executors, Administrators and Guardians accounts, etc.; Hall's Digest, 25. The same language is used in the substituted provision, Ib. 30. In the constitution of 1831 it is provided, with reference to the Orphan's Court "This Court shall have all the jurisdiction and powers vested by the laws of this State in the Orphans' Court": Sec. 10 of Art. 5.

With these different provisions of law and constitution as our only guide to go by, we are called upon to give our opinion whether the Orphans' Court is a Court of Equity.

It will be seen, at once, upon reviewing the several provisions of law to which I have referred, or quoted, and they are all that bear upon the question, that the Orphans' Court can only be considered a Court of Equity in a very restricted and modified sense. It is certainly true that, at the time Farrow v. Farrow was decided, the acts to be performed by the Court were of an equitable nature, and the proceedings and jurisdiction were such as pertained to a Court of Equity: but that did not make it a Court of Equity in the full sense of that term, but only gave it a "limited statutable jurisdiction" (using language of Judge Story) to be exercised, not by virtue of the court's inherent powers (for it had none) but as designated by statutory provision. In the beginning there was no distinct court, but the Justices of the Superior Courts or County Courts were to perform certain offices or duties with respect to the estate of *minors.* When the Courts of Common Pleas were created, these functions were transferred to the Judges of those courts whose sessions were to be in the same week as those of the Pleas Courts. Then the Court came to be held by the Chancellor by the

constitution of '92, and later (as now) by him and the Associate Judge of the county.

It may be conceded to be true that all the Orphans' Court jurisdiction is of an equitable character, and that its modes of proceeding are in the main, similar to those used in equity; and yet that will not make it, what it must be to try the plea in this case, a Court of Equity. *Sub modo* it is such a court; but it cannot entertain a bill for relief, or discovery as a Court of Equity can. By the old statutes it could call before the Justices, executors, administrators, guardians and others who had property of orphans in their hands, and make them exhibit inventories accounts, &c., and bind out minors to apprenticeships, invest their money, &c., but though this was equity jurisdiction to some extent, it was all to be done *secundum formam statute.* It had no other power than the statute gave. The establishment of Registers' Courts, and the jurisdiction they were endowed with, took away the control over executors and administrators to a great extent—a power, as has been before suggested, rather ecclesiastical than equitable. As evidence that the Orphans' Courts were not Equity Courts, but only Statutory Courts with jurisdiction of very limited equity subjects, and without any general power of relief even in them, I refer to the first section above in part quoted of the act, above mentioned, for establishing Orphans' Courts (Vol. 1, Del. Laws, 87) wherein it is provided that if upon hearing and examination thereof (that is, of the proceedings of those having to do with minors' property) it appears to the Justices that the minors' interest has been prejudiced by their misbehavior, the Justices are to certify the fact, which would be good evidence "for the party grieved to recover his damages at the common law." Why such a provision, if the Orphans' Court was a Court of Equity? A Court of Equity having taken jurisdiction of such a case for relief, would give it without sending the minor to the common law for recovery of damages for breach of the official bond. Looking at the question before us in every light that shines upon it for my vision, I cannot view the court as a Court of Equity like the Court of Chancery is even for or with respect to the subjects of its own jurisdiction; but simply as a court created by statute and invested with a small portion of equity jurisdiction, or rather with limited

and expressly defined jurisdiction over a very few subjects of equity cognizance, in which it proceeds (it could not appropriately do otherwise) by certain equity forms prescribed by law. But, as Courts of Equity in the ordinary sense do, it cannot proceed to hear any case in such manner as to give, where the circumstances require it, relief as in cases tried upon bill, answer, exhibits and depositions. There is no process of the court, or practice, by which the conscience of a party can be searched for evidence, no course of trial by depositions, no machinery or rules of pleading—nothing but simple petition, and appropriate action thereunder.

The jurisdiction of this Court to divide land among the parties entitled, is a legal as well as equitable jurisdiction, and was so when the first act was passed creating Orphans' Court jurisdiction; and when the dower act of 1816 was passed (that under which the petition in this case was filed) no jurisdiction of an equitable nature, in dower, was given to the Court, but only the power to lay it off by such machinery as it employed in cases of intestate estates. No express power is given to the Court to try any defence made to the widow's petition; that held to result from the language of the act, cannot, by any reasoning satisfactory to me which I have yet heard, be taken to invest a Court of the limited scope I have pointed out the Orphans' Court to be by the laws of its creation, with power to entertain and pass upon a defence so peculiar as that set up in this case, but denied to be valid anywhere; one which certainly depends for its allowance upon an equity only expressly asserted in the single case of Livingstone v. Livingstone, brought before us by the counsel for the devisees.

As illustrative of the defective nature of the equity powers of the Orphans' Court, I would call attention to what I may treat as a fact—that if a widow petitioning for dower under the act of 1816 had to rely upon discovery through the defendant of her husband's title to the lands out of which she claimed her dower, she could get no discovery through the Court's power, but would have to resort to the Court of Chancery for the exercise of the necessary equity power in the premises. Why should this be if the Orphans' Court is a Court of Equity adequate for the trial of dower cases, where equitable relief is needed in the support of petitions for assignment?

The consideration I have been able to give to the subject of dispute in this case satisfies me that the Orphans' Court has no power to refuse an order to assign dower upon any other defence than one which would be available at law, viewing it as I do as a Court of Equity only so far as the special subjects of jurisdiction originally committed to it are of an equitable nature, and the forms and methods of proceeding in it are adequate to the examination and decision of equitable questions.

The provision of the act of 1816 giving the Orphans' Court power to lay off a widows's dower in all cases (contemplated by the statute) when she is entitled to it, which Chancellor Ridgely considered an argument in favor of the equity character of the court, I do not regard as meaning anything more than that where there is no valid legal defence, the court may issue its order of assignment as in cases of intestacy.

There is still another view of this question to be considered. It cannot be disputed that the Orphans' Court is no Court of Equity to give a party any equitable relief, as has been before said, it could not entertain a bill by a widow for discovery to enable her, in that court or in a Court of Law, to establish her legal right—her right of dower being a purely legal one. What then can the Orphans' Court do when she presents her petition in it to have her dower assigned? She asks no aid of an equitable nature, but only the issuance of an order of assignment, which the law says she may have upon her application. Is this asking any aid of an equitable nature from an Equity Court? This is a crucial question. Certainly it is not: for the court has no inherent equitable power to grant it, and none of any kind not given by the act of 1816. She, therefore, in no sense calls for *help* from a Court of Equity to establish her title to dower (which could be withheld or granted on condition of doing equity), but only that it may, as the law directs, put in force the same machinery in her case for the assignment of her dower, which it employs every term in the case of widows of intestates. As this is legal machinery—that is created by statute law, and not having any essence or element of equity in it—no bar to its issuance can be allowed in the Orphans' Court, which has no power to give her equitable aid if she should seek it.

For the above reasons my opinion is that the decision made in

this case in the court below was right; and that the appeal should be dismissed.

HOUSTON, J., concurring:

Before the statute of 27 Henry 8, c. 10, commonly called the statute of uses, no jointure settled on a wife, either before or after marriage, could bar her dower at common law. *Vernon's Case*, 4 Rep., 1, because by the rule of the common law a right or title which any one had to any estate of inheritance or freehold, as an estate for life which dower is at common law, could not be barred by acceptance of any manner of collateral satisfaction or recompense for it, but could only be barred by release or confirmation, or by an act which was tantamount to a release or confirmation. And for that reason prior to the statute the wife took both her jointure and her dower at common law on the death of her husband.

But by the enactments of the statute a jointure made before marriage possessing the qualities required by its provisions is declared to be a bar to the widow's claim of dower, for it is expressly provided in the eighth section of it, that if any wife then had, or should thereafter have, manors, lands, tenements or hereditaments unto her given or assured after the marriage for the term of her life or otherwise in jointure (except the same be made to her by act of Parliament), and the said wife should survive her said husband then and in that case she should be at liberty to refuse on the death of her said husband to have and take the lands and tenements so to her given, appointed or assured during the coverture, for the term of her life, or otherwise in jointure, and thereupon to have, ask, demand and take her dower by writ of dower, or otherwise, according to the common law, of and in all such lands, tenements and hereditaments as her husband was and stood seized of any estate of inheritance at any time during the coverture. *Clancy on Husband and Wife*, 212, 213. And the court first ruled the former as a necessary implication from this provision of the eighth section merely, for the statute contains no such express provision as ours does.

And accordingly it was ruled as early as Vernon's case after the passage of the statute in which the jointure was made after the marriage, that if a jointure be made to a woman before marriage,

and be in conformity with the requisites of the act, the wife cannot waive it after the husband's death and take her dower, as she may of a jointure made to her after the marriage, and that by force of the above recited proviso of the statute, for if the provision be made after the marriage, then she is not bound by it, whether it be conformable or not to the requisites of the act, but may after her husband's death waive it and prefer her dower, or might elect to accept and take it in lieu and satisfaction of her dower at her will and pleasure in the latter case, of course. And therefore when made after the marriage her right of election between it and her dower at common law was expressly secured to her by the statute itself.

According to Lord Coke's definition of it one of the requisites to the making of a perfect jointure within the statute, it must either be expressed or averred to be in satisfaction of the wife's dower, and while the statute was never inforce in this State or the territory which now constitutes it, although we find in a few of our colonial statutes some brief and general recognitions of what were then denominated as settlements in the nature of jointures in lieu of dower without any other definition or qualification of them, it is not at all improbable that the early and rigid rulings in the courts of England in regard to that particular requisite, led to the adoption of an express provision to the contrary in our first statute enacted in the year 1816 in relation to devises to wives in lieu of dower, which provides that if any testator shall after the passing of said act devise to his wife any portion of his real estate, such devise shall be deemed and taken to be in lieu and bar of her dower out of the estate of her deceased husband in like manner as if the same was so expressed, unless such testator shall by his last will and testament declare otherwise, any law, usage or custom to the contrary notwithstanding: *provided* that nothing in this section contained shall deprive the widow of her choice, either to dower or the estate so devised, which choice shall be made before the Orphans' Court of the county in the mode prescribed in it. *Digest of 1829*, p. 168.

Under the statute of 27 Hen. 8. c. 10, it was early ruled that a devise by will was no bar of dower, unless it was expressly stated in it to be in satisfaction of dower; but if it was expressed

in the will to be in satisfaction of dower, then it was a bar.   *Co. Lit.* 36 b., and after stating in connection with these several other rulings not necessary now to be noticed, Mr. Clancy in his Treatise of the Rights, Duties and Liabilities of Husband and Wife at Law and in Equity, adds, " Such are the various decisions which have been made on the sufficiency of conveyances to constitute a legal bar of dower within the statute of 27 Hen. 8.   A distinction must, however, be observed between the operation of a *deed* and a *devise* conveying a provision to a woman as a jointure; if it be a deed the estate conveyed by it may be averred to be for the jointure of the wife, although it be not so expressed in the instrument, but if the land be *devised* by a man to his wife for the term of her life generally, it cannot be averred to be for the jointure of the wife, and in satisfaction of her dower."   *Clancy on Husband and Wife*, 212; *Vernon's Case*, 4 Rep. 4.   The substantial reason for which was that the whole will concerning lands by the statutes 32 and 34 *Hen.* 8 ought to be in writing, and no averment ought to be taken out of the will which can't be collected by the words contained in the will.   And immediately following the passage above quoted, Mr. Clancy further adds, " Another distinction to be observed is between conveyances made of estates in lieu of dower before, and after the marriage has taken place.   If the settlement be before marriage, and be in conformity to the requisites of the act, then the widow will be bound by it, and cannot claim her dower; but if the provision be made after marriage, then she is not bound by it, whether it be conformable or not, but may after her husband's death, waive it, and prefer her dower."   And in which case she was put, as we have before said, to her election between the two, for she could not have both, no more than a widow in case of a devise to her of any part of the real estate of her deceased husband now under our statute of 1816, can take it and her dower also, with this marked distinction between the two statutes in this respect, that under the English statute it must be declared in the will to be in bar or satisfaction of her dower, while under our statute such a devise of any portion of his real estate is to be deemed and taken to be in lieu and bar of her dower, as if the same was so expressed, unless declared otherwise in the will.   And as these are strictly legal enactments by legislative power and authority in both coun-

tries, they constitute the supreme law on the subject in each of them respectively, and therefore it is sufficient to say in all such cases *ita lex scripta est.*

But the defence in bar of dower set up in the case now before this court, is claimed to be ·an equitable defence purely consisting of an agreement entered into between William McCaulley and Sabilla McCaulley, his wife, after their marriage to settle upon her by their deed of trust through the intervention of Robert Waddell, as her trustee, all the property, real, personal and mixed belonging to her at the time of the marriage, to her sole and separate use, control, management and disposition, as fully as if she were a femme sole, for and during the life time of her said husband, William McCaulley, upon the express condition only that the said Sabilla McCaulley should and would pay all her own debts due from her before said marriage, and renounce all interest in the real and personal estate of her said husband, the said William McCaulley, except what he may give and devise to her by his last will and testament or by deed or other instrument during his lifetime, and when requested by her said husband join with him in any deed or deeds for the conveyance of his real estate or any part or parts thereof, and which covenant he performed by devising to her one-eleventh part of all his real and personal estate in his last will and testament in lieu of her dower, and therein referring to this stipulation of hers in the agreement as warranted by it.

Notwithstanding, however, a jointure settled on a woman previous to her marriage with the intention that it should be a bar to her claim of dower, might be wanting in many of the particulars requird by the statute in England, still it might secure as sufficient a provision for her, as if it were precisely conformable to all the requisites of it, and therefore it would be unjust that a widow in such a case should take advantage of the defect, and have both jointure and dower; and accordingly, to prevent this injustice where such a settlement had been made, a court of equity acting on the consciences of the parties would enforce a compliance with the contract by the widow, and restrain her from suing for dower. Nevertheless, although the 27 Hen. 8, will be so far restrained in its operation, equity in the exercise of this jurisdiction will always attend to the distinction made by the statute itself between pro-

visions settled before and during the marriage; for if they be before marriage the Court following the act, will consider them bars to dower; but, if during the marriage, then the widows will not be obliged to take such provisions in lieu of their dower, but will be at liberty to accept or reject them. And the reason for making widows abide by the provisions settled on them before marriage, and leaving them the power of selection between a provision made during marriage and their dower, seems to be this, that as before marriage they were *sui juris,* and capable of contracting, they shall be bound by such engagements; but as they were incapable of contracting during their marriage, they shall be at liberty after the marriage to choose the provision most advantageous to them. Such is the doctrine laid down by Mr. Clancy on the authority of the cases ruled in England on the subject up to the publication of his work, and which has not been substantially varied from since that time it is believed. *Clancy on Husband and Wife,* 219, 220.

And yet, as I have before said, notwithstanding the statute of 27 Hen. 8, never had any operation or effect, *per se* in this State or the territory now composing it, as the provisions of our colonial statutes, and particularly of our act of 1816, in relation to jointure and devises by testators of any portion of their real estate to their widows in lieu of dower, and the election thereby secured to them in such cases, were evidently derived from that statute, it strikes me that the well established principle and distinction ruled in the Courts of Equity in England between such contracts made by a husband and wife before and during their marriage, apply with even greater force in such cases under our statute than under the English statute, inasmuch as the provisions of our statute in both respects are drawn apparently by design in stricter and more imperative terms than those of the English statute; for while under the statute of 27 Hen. 8 the ruling of the court on the first point that where the jointure was made before marriage it was a bar to the claim of dower and admitted of no election, was by implication merely, nor was anything said in it as to the age of the intended wife, our statute expressly provides in the 3d Section of it in relation to jointure that "If a woman of the age of twenty-one years or upwards, (under the English statutes she may be a minor

still) prior to and in contemplation of marriage, shall, by agreement, accept an estate in, or a charge upon, real estate, to take effect at or before the decease of her intended husband, and to continue during her life, as a provision for her support in lieu of dower in the real estate of her intended husband, such estate, or charge, shall be valid, and shall be a bar to her demand of dower in such real estate." While at the same time the provision in our statute in relation to the "Election of Dower or Devise" is also characterized by increased strictness in the phraseology of it when compared with the corresponding provision in the English statute. It is as follows: "Sec. 5. If a testator shall devise to his wife any portion of his real estate, such devise shall be deemed and taken to be in lieu and bar of her dower out of the estate of her deceased husband, unless such testator shall, by his last will and testament, declare otherwise; but the widow shall have her election either to dower or the estate so devised." And such being the marked difference between the provisions of the two statutes, the better is the reason, I think, why this court in the exercise of the equitable jurisdiction invoked in this case on behalf of the appellants, should be governed by the distinction made in the equity decisions in England between provisions made in lieu of dower before and during marriage: for by the express and positive terms of our statute there are but two methods in which the right of dower given by it may be barred, one by a formal jointure made before marriage as prescribed in the 3d Section, and the other by a devise of some portion of his real estate by a testator to his widow, as prescribed in the 5th Section of it, and which is thereby always made subject to her election after his death.

In support of the equitable defence set up against the claim of dower in this case one of the first authorities to which the counsel for the appellants have referred us, is the case of *Farrow v. Farrow*, 1 Del. Ch. Rep. 457, before Chancellor Ridgely in the Orphan's Court of Kent County, February Term, 1822, but in that case, which was six years after the enactment of our present statute, and when it constituted the only statutory provisions then in force in the State in regard to jointures or devises of real estate and election in lieu of dower, he fully recognized as existing under them in this State the distinction between a contract made before and during

marriage by husband and wife for a collateral satisfaction of her dower in a Court of Equity, as well as in a court of law. For in that case, although the contract between Farrow and his wife was formally made and executed before their marriage, and in contemplation of it, and was to the effect that if it should take place, and she should be the longest liver, that she should have and receive after his death one-third of his personal estate in lieu of and in full satisfaction of her third or portion of his real or personal estate, the Chancellor in announcing his opinion after citing several reported cases referred to by the counsel in their argument, concludes his statement of the law of the case with the following citation : " In *1 Madd. Ch. Pr.*, 355. the law is thus summed up, that any provision, however inadequate or precarious it may be, which an adult before marriage agrees to accept in lieu of dower, will amount to a good equitable jointure." And the same qualification and distinction is thus indirectly, though clearly recognized by him from the beginning to the close of his opinion. In the case of *Davila v. Davila*, 2 Vern., 274, cited by them, the contract was made before marriage. Mr. Davila in consideration of the marriage with his intended wife, and of 1000 £. covenanted if his wife survived him, to pay her 1500 £. in a month after his decease, in full of dower, thirds, custom of London or otherwise, out of his real or personal estate. They were married and he afterwards died intestate and without issue, and his wife filed a bill against his administrator for a moiety of his personal estate under the statute for the distribution of intestate's effects, and the marriage agreement was pleaded in bar, on which the plaintiff contended that it did not debar her from recovering a moiety of the personal estate ; or that if she might not have the moiety of the personal estate and the 1500 £. she might have that of the two provisions which was most beneficial. But the Lord Chancellor held that by the words of the agreement she was tied down to accept the 1500 £. in full for what she might claim for dower or thirds, or by the custom of London, or otherwise, out of the real or personal estate. His Lordship therefore allowed the plea.

The case of *Livingston v. Livingston*, 2 Johns. Ch. Rep., 537, is no authority, I think, on the question now before us, because it did not involve a contract or agreement concerning dower or

jointure, but was simply the case of a post-nuptial agreement between a husband and wife, the latter being seized in her own right in fee at the time of their marriage in May, 1809, of a house and lot (No. 56) in Greenwich street in the city of New York, upon which after the marriage the husband had expended in repairs and improvements $2,500. In April, 1814, they agreed that he should purchase another lot in her name and build a house thereon, and that the cost of erecting it should be paid out of the house and lot first mentioned on the sale of it for that purpose to be made when the new house was completed. The bill of complaint filed by the husband stated that in pursuance of the agreement in May, 1814, he purchased a lot (No. 51) in the same street for $6,000, which he paid out of his own money, and for which he took the deed in his wife's name; that he erected a house on it in the building of which he expended more than $16,000 of his own money. That in September, 1815, they went to reside in it, and soon after, on the 21st day of the same month his wife suddenly died, while he with her concurrence was in treaty for the sale of the first mentioned house and lot. That she left two infant children, her heirs at law, to whom the legal estate in both houses and lots descended. The plaintiff alleged that the consideration for the agreement having then failed he was entitled to avoid it and consider the children as trustees for the plaintiff in regard to the second house and lot, and, among other relief sought, prayed that the house and lot first mentioned might be decreed to be sold and the proceeds of the sale of it after deducting costs might be applied to reimburse his expenses on the second house and lot. The answer on behalf of the children was by the clerk of the court, and as usual in such cases, was formal merely and admitted nothing as to the agreement, but the facts were proved as alleged in the bill, and the relief was granted and a decree entered for the sale of the house and lot first mentioned for the purpose before stated. The decision was by Chancellor Kent in the year 1817, who considered it as constituting under the circumstances a case of resulting trust in the children to whom the title to both of the houses and lots had descended on the death of the mother, for the benefit of the father who had bought the second lot in her name and built the other house upon it and paid for them with his own money on

the faith of the agreement that as soon as it was completed the first mentioned house and lot was to be sold and the proceeds of the sale thereof were to be applied to the cost which he had incurred in erecting the new house pursuant to it, and which would have soon been specifically completely complied with on the part of his wife, but for the accident of her sudden death while he was with her consent in treaty for the sale of the house and lot as agreed on for that purpose. And I think it worthy of remark that while in that case the just and equitable right and claim of the plaintiff to the relief prayed for was so strong and strikingly manifest, that the wife herself was not in court, as in the case now before us, objecting to or opposing the execution of the agreement after the death of the husband, but on the contrary was fully proved to be all the time consenting to it up to the time of her decease. And yet, as strong and peculiar as the facts and the equitable claim of the plaintiff in that case were, and as long as it has been since it was decided, it seems to stand alone without any other case like it in the books, on the extreme verge of even the jurisdiction of equity over the limited subject of post-nuptial contracts between husband and wife, for although it is referred to and recognized by Mr. Justice Story in his work on Equity Jurisprudence as an authority on that subject in such a case, he classifies it with a few other cases which under peculiar circumstances constitute exceptions to the principles of the common law in regard to contracts made between husband and wife after marriage, " which," he says, " *a fortiori*, apply to pronounce them a mere nullity; for there is deemed to be a positive incapacity in each to contract with the other. But here again," he adds, " although Courts of Equity follow the law, they will under particular circumstances give full effect and validity to post-nuptial contracts." And among the three or classes of adjudged cases referred to for illustration of the particular circumstances under which this has been done, the case of *Livingston v. Livingston* is also included. *2 Sto. Eq. Juris.* Sec. 1372.

But as I have before observed, the agreement in that case was not a contract between a husband and wife for a collateral satisfaction of dower, or a jointure in lieu of it, nor had it any of the elements or features of such a contract, and therefore the ruling in

it can have but little, if any application to the question presented in the case now under consideration. And yet no other case I apprehend, can be found in the books in which even a Court of Equity has held valid and binding a contract of any kind made between a husband and wife after their marriage and substantially decreed a compliance with it against the latter, or her legal representatives after her death.

So in the case of *Liles v. Fleming,* 1 Dever., Eq., 185, the contract was not for a collateral satisfaction of dower, but the husband had before the marriage agreed with the wife that in case there should be a child of the marriage all the property to which she was entitled, either in possession or in action, should be settled upon her, and after their marriage and the birth of a child to them he confirmed it by giving her a written acknowledgment under his hand and seal in the following terms : " Be it known to all whom it may concern, that I, Jacob Liles, of &c., having intermarried with Frances Holland, widow, &c., and by her having had one son called Richard Liles, I do hereby certify that all the property which came by my said wife of every description I give to her and her heirs forever." The bill in equity was by the wife against his executor and others after his death, and her claim was for personal property and money exclusively which she had at the time of the marriage, consisting in part of slaves, several of which he had bequeathed by his will to his children by a former marriage, and in it had made a very small provision for the plaintiff who had formally entered her dissent from it. The prayer was to have the defective instrument set up, and also for a distribution of the assets of the testator pursuant to the statute. The defendants in their answer put the plaintiff to the proof of the ante-nuptial agreement, and insisted if it was made that the plaintiff should be put to her election, contending that she could not claim under the agreement, and also her distributive share of the testator's assets. But the court held upon the evidence and the proof specially referred to and stated in the opinion that the testator had declared and admitted that he had executed the paper in pursuance of his engagement entered into with her before the marriage, she was not to be put to an election, but was entitled to take under the agreement, and also her distributive share of the assets of the testator.

It is therefore manifest that the agreement in that case was not even a post-nuptial agreement pure and simple between a husband and wife to settle all the personal property owned by her at the. time of the marriage on her in a certain specified event which afterwards occurred, much less a post-nuptial contract for a collateral satisfaction of a wife's claim of dower in the whole of her husband's real estate.

But I will state in order to show that *Livingston v. Livingston* is not considered under the particular circumstances of that case an authority in the State of New York on a post-nuptial contract between husband and wife similar to the contract in the case before us, that is to say, for a collateral satisfaction of her right of dower or election under the statute of that State. I will refer to a recent case in the Supreme Court of that State in which it was decided that an agreement by a wife in articles of separation to release her dower in her husbands lands, will not discharge them therefrom, unless she elects to ratify the agreement after his death. Although she accepted and had been for many years during his life time, and still was since his death, in the enjoyment of the pecuniary provision for her maintainance therein given, she is not estopped from claiming dower after her husband's death. The wife cannot release to her husband her dower right directly or indirectly. *Gridet v. Brown*, 3 Abbott's New Cases, 295. By the articles of separation the quiet and undisturbed possession of the sum of three thousand dollars paid to her trustee named in them, and all her personal property of which she was then or might , thereafter become possessed with the right to dispose of the same, as though she were a feme sole and unmarried, were guaranteed to her, and which she agreed to accept in payment and satisfaction of all and every claim on her part for or by reason of her intermarriage with him, for alimony, dower, right of dower or otherwise, and thereby released the lands whereof he was then seized from all dower and right of dower, and also all claim of dower in and to any land he might thereafter become seized of, and covenanted upon request to execute in the future and deliver to such person or persons. as he or his heirs, executors or administrators might direct all necessary conveyances for the more complete release of any dower or claim of dower therein.

The action was against her and others for partition of lands of which her late husband was a partner owner at the time of his death, and the only subject of real contention in it was whether she should have dower in so much of the land as might be set off as the share of her deceased husband in it, and the court held that as far as the instrument purported to release her dower to her husband it was a nullity. *Carson v. Murray,* 3 Page, 483. That could only be done in law by her uniting with her husband in a conveyance of the land to a third party as provided for by statute. But it was urged in opposition to her claim of dower that she was equitably estopped by the agreement and the provision which she had received and enjoyed ; or if not, that then the case came within the provision of the revised statutes of that State that "If a pecuniary provision be made for the wife in lieu of dower, she shall make her election whether she will take such pecuniary provision, or be endowed of the lands of her husband, but she shall not be entitled to both. The court, however decided against both of these equitable defences and said that in order to put the wife to such election the pecuniary provision alluded to must in some way, by last will or otherwise, be tendered to her at the death of her husband, or in other words, as was held in the case of *Crain v. Cavana,* 36 Barb., 410, " that this equitable provision to bar dower must be a provision to take effect in possession or profit immediately on the death of the husband." And the judgment was that Mary Ann Brown, the widow of the deceased husband, John D. Brown, was endowed of the land in question. The case of *Livington v. Livington,* it is true, was not even cited or referred to in that case by either the counsel or the court, but that could have only been because no one considered it to have any application to a contract for a collateral satisfaction of dower under the express provisions of the statute of that State.

The two American cases of *Livingston v. Livingston* and *Liles v. Fleming and others* were each decided on their own particular circumstances, and although neither of them involved the question of an equitable bar of the legal right of dower in real estate, they have each gone further perhaps, than any other case cited in compelling compliance with post-nuptial contracts between husband and wife in courts of equity, but the justice and equity of the

claim of the complainant under the contract in each of those cases were peculiarly strong and exceptional in their character, and the failure of the relief asked for in either of them would certainly have been not only against equity and good conscience, but grossly unjust and inequitable to the complainant under the particular circumstances. But I must say that I have been unable to discover in the facts and circumstances of the case now before us any such analogy in principle to those cases, or any such injustice, hardship or wrong to the husband or his legal representatives to result from the failure of the contract in question, as would warrant a court of equity in compelling a compliance with it by the wife after his death against her will and consent, and the express election which she has since made in the court below under the provisions of the statute in such case made and provided.